

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-19-00027-CV

_____

IN THE INTEREST OF A.L.J., A CHILD

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2018-1808-DR

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

## MEMORANDUM OPINION

This is an appeal from a final judgment in a suit affecting the parent-child relationship. In Mother's sole point of error on appeal, she contends that the trial court erred when it granted Father's request to change the last name of their child, A.L.J., to Father's surname.[1] We conclude the trial court did not abuse its discretion in granting the name change because its finding that the name change was in A.L.J.'s best interest was supported by legally and factually sufficient evidence. We affirm the trial court's judgment.

## I.    Background

A.L.J. was born in December 2017 and lives with his mother, Mary, in Longview.[2] Mary agreed that A.L.J.'s father, Andrew, had been a part of A.L.J.'s life since his birth and that he financially assisted with A.L.J.'s living expenses. Mary conceded that Andrew's family was significantly involved in A.L.J.'s life. Mary stated, "Whenever I need help I can call them." Andrew's family helped Mary with childcare, assisted her financially, and helped her secure housing. Mary said that A.L.J. had never resided outside of the State of Texas. When asked how many times Mary's family had seen A.L.J., she stated, "This would be my dad's fifth time driving here. We went there to Virginia. My mom was here when he was born, came another time, and she's planning on coming in the summer, as well."[3]

---

[1]To protect the confidentiality of the child involved, we refer to the adults by pseudonyms and the child by initials. *See* TEX. R. APP. P. 9.8(b)(2).

[2]At the time of the hearing, A.L.J. was fourteen months old.

[3]Mary was born in Russia, was adopted when she was three years old, and grew up in Virginia. When she was eighteen, she moved from Virginia to Texas. With the exception of A.L.J., Mary had no family living in Texas. She said that her adoptive father's side of the family resided in Virginia and that her brother lived in Maryland. Although

2

Mary agreed that A.L.J. had far more interaction with Andrew's family than he did with her family. Mary said she was opposed to the name change because she was not married to Andrew, but was, instead, "a single mother." Mary did not oppose Andrew's surname, nor did she believe Andrew's family name had a bad reputation in the community. Mary said that she hoped to get married someday, but she assured the court that she would retain her surname in the event she did. She stated, "I was married before, and I like my surname." Mary agreed that A.L.J. was too young to know his name.

Mary explained that A.L.J.'s first name was taken from Mary's brother's name, and his middle name was taken from Andrew's name. Mary initially said that when she decided on A.L.J.'s name, Andrew was "[p]retty much" in agreement with it. She subsequently stated, however, that Andrew objected to A.L.J.'s first name and to the fact that A.L.J. was not given Andrew's surname. Regardless, Andrew signed off on the acknowledgement of paternity, which showed that A.L.J. had been given Mary's surname.

Mary testified that although her surname was her adoptive family's name, it was important for A.L.J. to have her surname because he was her only known blood relative. She continued, "[I]t can help him have -- like be able to be connected to two different and three different pieces of himself and his history." Mary did not believe it would be detrimental for A.L.J. to have a different surname than his father's, and she did not believe that when A.L.J. became school age, that having her surname instead of Andrew's would cause him any anxiety.

Mary was not intent upon moving back to Virginia, she wanted the option to do so in the future. Mary stated that if she did move to Virginia, her family would help her with A.L.J.

Mary's grandfather, Steve, traveled from Virginia to Texas to testify at the hearing. Steve explained that Mary had been adopted when she was three years old, and that they did not know much about her family background. According to Steve, Mary had never had any contact with her biological family members. Referring to A.L.J., Steve said, "He's very well cared for here, he's surrounded by love. And we greatly appreciate that because we're not here on a daily basis." He continued, "When -- [Mary] and [A.L.J.] visited us over Thanksgiving, we had 25 family members together the day after Thanksgiving. He was surrounded by love there, too." Steve explained that A.L.J. was Mary's sole blood relative, and in his opinion, it would be good for A.L.J. to retain Mary's surname.

Andrew testified that he met Mary on a dating website, after which Mary traveled to Longview to meet Andrew. They were both living in Longview when A.L.J. was born. Andrew stated that he had extended family living in East Texas, including his mother and father, and that they were both involved in A.L.J.'s life. According to Andrew, his parents had also been involved in Mary's life. Andrew stated that his parents helped her financially on numerous occasions, helped out with childcare, and took A.L.J. to see the doctor. In addition, Andrew said that his parents treated Mary like she was their daughter and that all of the parties involved got "along really good." Andrew testified that he had been a part of A.L.J's life since he was born, had financially supported A.L.J., had provided him with medical insurance, and had exercised his periods of possession. Andrew stated that he was currently employed by a company located in Kilgore and that he had no plans to leave East Texas.

4

Andrew explained that he believed it would be helpful for A.L.J. to have his surname to avoid confusion at places such as the doctor's office. Andrew also explained that he hoped A.L.J. would become involved in sports when he became older and that he would prefer A.L.J. to be identified by his surname. In Andrew's opinion, he believed that there would be a stronger father-son bond if A.L.J. had his surname. Andrew agreed with Mary that A.L.J. did not know his name due to his age. Andrew stated that he had the same surname as his parents and that he would "[n]ever" change it.

According to Andrew, Mary did not give him a choice when it came to naming A.L.J. Andrew said he did not have an issue with Mary's choice of A.L.J.'s first and middle names. When asked why he did not object to using Mary's surname when A.L.J. was born, Andrew explained, "I did, but from what I understood, I really didn't have an option whenever I was signing the birth certificate, because the way I [sic] was described is that it's harder to get your name onto a birth certificate than it is to take your name off a birth certificate." He continued, "So I just went ahead and signed whenever I was at the hospital on the acknowledgement of paternity." In other words, Andrew believed he did not have a choice.

According to Andrew, he did not know any children that did not have their father's surname. He conceded, however, that those children were all products of married couples. Andrew said that he believed it would cause A.L.J. trouble when he became school age if he did not have Andrew's last name. He agreed, however, that if A.L.J. kept Mary's surname, Andrew would just "have to deal with" it.

5

Andrew's father, Scott, stated that he considered Mary "[a]lmost a daughter." Scott said that Mary was welcome in his home "any time, day or night, never be a 'no.'" Scott hoped their relationship would continue to be a good one. He explained that he and his wife had physically helped Mary move to her new home, he gave her a referral for a job, and they helped by watching A.L.J. "pretty much any time needed." Scott stated, "[I]f our own biological kids asked for it and we'd do it, we'd do the same thing for [Mary]." According to Scott, they would continue to support Mary in the same manner, and they would help her physically, financially, and emotionally.

Scott said he was extremely close to A.L.J. Andrew offered, and the trial court admitted, a document showing the dates on which A.L.J. had spent the night at Andrew's parents' home. Scott stated that when A.L.J. spent the night with them, it was in addition to, and not in lieu of, Andrew exercising his standard periods of possession.[4] He explained, "We don't do things for [Mary] and [A.L.J.] because that's our grandchild, we do it because we love them both equally as part of our family. That's the bottom line." According to Scott, he would continue to love A.L.J. without regard to his last name, stating, "His name has no effect on my love for that child."

After listening to the witnesses and hearing arguments of counsel, the trial court found that it was in A.L.J.'s best interest to change his name to include Andrew's surname.[5] This appeal followed.

---

[4]Scott explained that he was asked to prepare the document for the hearing and that they did not "keep score."

[5]The court found, "[W]e still are at a time when it would be in the best interest of this young man to share the last name of the father that he is actively involved in within the same community at this time." On March 1, 2019, Mary filed a motion for new trial arguing, "There was no evidence of a substantial and probative character to support the trial court's decision to order the child's last name to be changed to [Andrew's surname]." On that same day, she asked the trial court to enter findings of fact and conclusions of law. On March 18, 2019, the trial court entered its

## II.     Discussion

Mary contends there was legally[6] and factually[7] insufficient evidence to support the trial court's finding that it was in A.L.J.'s best interest to change his surname. An appellate court reviews a trial court's decision to change the name of a minor child for an abuse of discretion. *Bennett v. Northcutt*, 544 S.W.2d 703, 706–08 (Tex. App.—Dallas 1976, no writ). "The test for abuse of discretion is not whether, in the opinion of this Court, the facts present an appropriate case for the trial court's actions." *In re Guthrie*, 45 S.W.3d 719, 723 (Tex. App.—Dallas 2001, pet. denied) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985)). Instead, the test is whether the trial court acted without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). Moreover, an abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence. *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding).

---

findings and conclusions, which stated, in part, that it was in A.L.J.'s best interest to change his name to Andrew's surname. Two days later, the trial court denied Mary's motion for new trial.

[6]A legal sufficiency challenge is a relevant factor for an appellate court's review, not an independent ground for reversal. *In re M.C.F.*, 121 S.W.3d 891, 895 (Tex. App.—Fort Worth 2003, no pet.). We will sustain a challenge to legal sufficiency only if (1) the record demonstrates a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence that was offered to prove a vital fact amounts to no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). When determining whether there is legally sufficient evidence to support the trial court's finding under review, we must consider evidence favorable to that finding, if a reasonable fact-finder could do so, and disregard evidence contrary to that finding, unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005).

[7]When reviewing the factual sufficiency of the evidence, we consider all the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong or manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). The fact-finder is the "sole judge of the witnesses' credibility and the weight to be given their testimony." *Keller*, 168 S.W.3d at 819.

The standards for changing a minor's name are controlled by the Texas Family Code, which states, "The court may order the name of a child changed if: (1) the change is in the best interest of the child." TEX. FAM. CODE ANN. § 45.004(a). "A parent's interest and desire is only a secondary consideration." *In re J.K.*, 922 S.W.2d 220, 222 (Tex. App.—San Antonio 1996, no writ). Texas has no statute giving the right to name a child to either of the parents; however, the name given to a child by one parent will not be changed unless the complaining party shows a good reason for the change. *In re M.L.P.*, 621 S.W.2d 430, 431 (Tex. App.—San Antonio 1981, writ dism'd).

Courts consider the factors that address the child's best interest, not the needs of a particular parent or customs or traditions. *Guthrie*, 45 S.W.3d at 724. Some of the nonexclusive factors we consider in a best-interest examination are as follows:

[W]hether the changed name or the present name would best avoid embarrassment, inconvenience, or confusion for the custodial parent or the child;

whether it would be more convenient or easier for the child to have the same name as or a different name from the custodial parent, either the changed name or the present name;

whether the changed name or the present name would help identify the child as a part of a family unit;

the length of time the surname has been used;

parental misconduct, such as support or nonsupport or maintaining or failing to maintain contact with the child;

the degree of community respect associated with the present or changed name;

whether the change will positively or adversely affect the bond between the child and either parent or the parents' families;

8

any delay in requesting or objecting to name change;

the preferences of the child;

the age and maturity of the child;

when the child maintains the mother's surname, assurances by the mother that she would not change her name if she married or remarried; and

whether the parent seeking the change is motivated by an attempt to alienate the child from the other parent.

*Id.* at 725–26 (footnotes omitted) (citations omitted). "Thus, the determination of the child's best interest in a name change is fact specific." *Id*. at 726. Courts are not required to ascribe the same weight to each factor. *In re H.S.B.*, 401 S.W.3d 77, 84 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Therefore, the significance of each factor is dependent upon the facts of the particular case, so one or more factors may be completely irrelevant to the issue in that case. *Id*. Here, because of A.L.J.'s young age, an examination of many of the suggested factors is irrelevant.

At the hearing, Mary expressed that she would like for A.L.J. to continue carrying her surname because she was a single mother and A.L.J. was her only blood-relative. She also gave the court assurances that she would not change her last name in the event of a future marriage. Yet, there was very little, if any, evidence, that changing A.L.J.'s surname would result in negative consequences for Mary or A.L.J. To the contrary, the evidence legally and factually supported the trial court's finding that it would be in A.L.J.'s best interest to change his name to Andrew's surname.

First, A.L.J. was fourteen months old at the time of the hearing. He had little, if any, attachment to Mary's surname. Thus, it would not disrupt A.L.J.'s life to change his last name at

9

such a young age. Likewise, at fourteen months old, there are no school records or extracurricular activities identifying or connecting A.L.J. to Mary's last name. As far as A.L.J.'s health care was concerned, Andrew testified that he carried A.L.J. on his medical insurance. Thus, having Andrew's surname may simplify matters relating to A.L.J.'s medical appointments, as well as the resultant billing process.

Although Mary was clearly involved in A.L.J.'s life as his primary caretaker, Andrew and his family were also an important part of A.L.J.'s life and had been since his birth. Andrew supported A.L.J. financially, provided his health insurance, and consistently exercised his periods of possession. His family, who also lived in East Texas, had been, and intended to continue being, significantly involved in A.L.J.'s life. On the other hand, Mary's family lived in Virginia and Maryland. By virtue of the distance, and not through lack of caring, her family was less involved in A.L.J.'s daily life and seldom had the luxury of spending an appreciable amount of time with him. Thus, Andrew's surname would best help identify A.L.J. with the family unit.

Moreover, Andrew and his family had ties to the local community, whereas Mary was not from the area, and neither was her family. When we consider that A.L.J. will be living in a community where Andrew and his family already have a history, A.L.J.'s future relationship with the community would be better served if he had Andrew's surname.

Lastly, the evidence clearly showed that Andrew was not making a name-change request in an effort to turn A.L.J. against Mary. The record is replete with testimony that Andrew and his family held Mary in high regard and that it was their intention to continue doing so regardless of

10

the outcome of this proceeding. Moreover, we see no reason why Mary and A.L.J. could not continue to strengthen the bond between them, without the benefit of A.L.J. having her last name.

For these reasons, the trial court did not abuse its discretion when it found that it was in A.L.J.'s best interest to change A.L.J.'s name to include Andrew's surname.

## III. Conclusion

We affirm the judgment of the trial court.


Ralph K. Burgess
Justice

Date Submitted:     October 25, 2019
Date Decided:       November 6, 2019